Okay, Mr. Redman. Good morning, Your Honors. May it please the Court, Wesley Redman. I'm here on behalf of Dynamic Security, Inc., and there's a cross-appeal today. We have provided in our briefs a number of reasons why the jury verdict and the court's failure to set aside the judgment should be set aside by this court and why the summary judgment should be affirmed. What I want to concentrate today and focus on today is the determination that Key engaged in protected activity is against the great weight of the evidence. The issue in this case can be highlighted by this quote from this circuit in Boyle v. Virginia College, 619 Federal Appendix 859. I would tell you what I'm most interested in hearing about, and that is the failure of the district court to give a proposed jury instruction as to whether Key engaged in protected activity, okay? Yes. So there's a retaliation claim. That's what's really going on here, and Dynamic asked the district court for an instruction that would tell the jury, no matter how the complaint is made, it must on race. The district court refuses to give that instruction. Instead, it gives an instruction that says, for the first element, protected activity, Ms. Key claims she engaged in protected activity when she complained to Dynamic that she felt discriminated against based on race. Never asked the jury to make a determination, though, about whether she communicated that belief or not. Correct, Your Honor, and we think that is a fundamental abuse of discretion that caused prejudice to us because, as the Blow case said, whether she has a good faith belief is of no moment unless she has actually complained about race of discrimination. That's the first. I think that could go either way on this record, whether she complained of race discrimination. I think a jury could infer it or not. The problem is, it's not clear to me that the jury was ever instructed that it had to make that determination. Your Honor is correct, and that's one of the major errors that we raised, is they absolutely were not told that, and we think if you look at the cases from this circuit, the important thing is that you actually requested an instruction that would have required the jury to make that determination, and the district court refused to give that instruction. Correct, Your Honor. We think that is a fundamental element of a growth of protected activity, and it was prejudicial error for the court not to do it. As for what the court said, the cases in this circuit have been clear that the employer actually has to know they are complaining about race discrimination. Not that it can be inferred. If you look at the cases that have come out of this court, where the courts, there have been cases where people complained of unfair treatment, singled out, campaign of harassment, hostile environment, a racist department, and all of those the court said, that's not protected activity. You have not let us know that you are complaining about race. We're not asking for magic words, but as this court said in South V Tampa, and also in Hamilton for Sheridan Health Court, which is at 602 Federal Appendix 485, with no mention of race, there is no protected activity. The Blow case, four times. You know, I don't know, I think there might be enough evidence in this record for the jury to infer that the employer understood that this was a race complaint, that the complaint about the hair policy was race-related, but it does seem to me that the important thing is that the jury has to make that determination and has to be instructed that it has to make that determination. Yes, your honor, and my last comment on that is every document, every piece of paper, every complaint, every comment, every email. That's a good jury argument for why the jury would find for you if they were instructed properly to make that determination, Mr. Redmond. Yes, your honor. The last point I would like to make, and I think there's evidence going both ways on that. Well, I think catastrophe management comes into play, which we've all fully briefed in this case, which says hair does not equate to race, but in the time I have left, I also would like to talk about the good, her good faith objective belief, which is the pivotal factual issue in this case. Whether or not she had a good faith belief based on Gloria Robinson's statement that the Koreans send these memos that say that African-Americans can't wear dreadlocks. We think that is absolutely barred by the best evidence rule. Yeah, the best evidence rule is, I think you're misunderstanding what the best evidence rule is. Well, the best evidence rule is, you know, this is just a copy, you know. The best, actually the best evidence rule, and there's a quote from the Tenth Circuit that I think says it best. It says, rule 102 meeting is as plain as day. It demands that court exclude secondary evidence of an original's content unless the original is in evidence. The original, exactly. It's a copy versus original question. This court has rejected testimony from people when they are talking about the contents. Yeah, but that's, I mean, look, if she's been told that they send memos about this, that informs what her belief is, okay? That's a hearsay, that's a hearsay exception. Oh, you may well be right about that, but you're saying it was best evidence. I'm saying those are two different things. And I'm saying, it is not a best evidence exception for what the use of it was for. This court has said repeatedly, if you're describing the contents of a document, if you're listing the contents of a document. But she wasn't trying to get the document into evidence. Exactly. She was just trying, she was just describing what she was told and then forming the basis of her belief. But the best evidence rule is not that narrow. The best evidence rule applies whenever anyone is describing the contents of a document. Well, Mr. Edmund, you're over time. Yes, thank you. I promise you, you're not right about the best evidence rule. Thank you. Let's hear from Ms. Palmer. Wait a minute, though. I want to make sure I'm getting this right. We've got six different lawyers listed here, and I want to make sure I'm taking everyone in the correct order. So that your counsel for Ms. Key, you've got counsel for the EEOC. And then, I guess, Hyundai and Ms. Brown, you're here for who? Okay, you're only here to defend a judgment in your client's favor. Is that right? And then, Ms. Leonard, you're going to represent on rebuttal. Is that right? Okay, got it. But also defending a judgment in your favor, right? Got it. Okay, Ms. Palmer. My name is Leslie Palmer, and as you stated, I represent Debita Key in this appeal. Heather Leonard will be addressing the post-trial response to Mr. Redmond. I am handling the pretrial dismissals. Okay, got it. The dismissals should be reversed in this matter for three main reasons. First, Debita Key exhausted her administrative remedies with regard to all three entities in this matter. Second, the record evidence shows that Debita Key, her Title VII claims were timely filed. And then third, there was a general understanding that Key's complaints were protected activity. With regard to the administrative remedies, we have three different entities in this matter. The main argument at the motion to dismiss stage was that HEA was not named in the EEOC charge. We believe that the court erred in that finding, and at the very least, that the matter should have been put off to summary judgment. Is it not true that the charge of discrimination only had Hyundai Motor and Dynamic? That is accurate, is it not? So not exactly, Your Honor. This case was rife with EEOC errors. Ms. Key represented herself at the EEOC. She went in, she filled out a very detailed questionnaire, and I know you guys had a question about that earlier this week. Her questionnaire mentioned individuals by name, entities by name, though the wrong name, but did mention the entities. The EEOC then formalized that charge and only formalized it against Dynamic Security. Ms. Key did not have any control over that process. She was at the whim of the EEOC to do what they said. Then, well into the investigation, they issue another right to sue, I'm sorry, another EEOC charge dated back to the original intake questionnaire against Hyundai, and even that charge, it does list under the employer Hyundai Motor Manufacturing, but within the statement of facts, it lists Hyundai and it lists Cassandra Williams, who we later learned was an employee of Hyundai Engineering. And if you look at the record evidence, specifically document 8114, which was the late notice to Hyundai Motor Manufacturing of the EEOC charge, in that notice the EEOC recognizes that the questionnaire was a charge. So going to the case you had earlier this week, while generally, yes, we do look to the charge, the EEOC is entitled to consider the questionnaire as a charge, and it did so in this case. With regard to the administrative exhaustion of HMMA, the same argument, the EEOC's untimely notice to them cannot be attributed to Ms. Key. And then Mr. Redman, on behalf of Dynamic Security, argued that we had not exhausted administrative remedies with regard to any termination claim. We believe the evidence is that Ms. Key was removed from Hyundai, Ms. Key was never reassigned, and that she very thoroughly pled that in her charge, that remedies have been exhausted. With regard to the timeliness, the 90 days, whether she filed her Title VII charges, the EEOC may also be speaking to that, but the court inferred the three-day mailing rule against the evidence. Ms. Key's testimony was clear that she never received the Dynamic Security notice of right to sue. That goes contrary to the holdings incurred. And then with regard to the protected activity, it's clear in this case that everyone involved understood Ms. Key's complaints to be racist discrimination, and the court was very specific to carve this out of catastrophe management. Catastrophe management does not stand for the dreadlocks can never be protected. It was decided at a motion to dismiss stage where it was not pled that dreadlocks were a mutable characteristic. In this case, Ms. Key pled thoroughly that it was protected activity. That's a very narrow reading of catastrophe management. You may well be right about it not being as you know, as categorical as some might read it, but I'm not sure it's quite as narrow as you read it. I agree, Your Honor, and I could talk to you for days about catastrophe management. It would not change the fact that it binds this panel. Correct, to the facts of the opinion. Okay, let's hear, I guess, from Ms. Sharon. Good morning, Your Honor. I'm here today with respect to Ms. Key's appeal regarding the pretrial rulings and specifically here to address the issues resolved by the district court on summary judgment, the notice of right to sue issue, the issue regarding the disparate treatment claims, and the issue regarding the retaliation claims. I'd like to begin if I could with the notice of right to sue, and our argument is that the district court erred in applying the three-day presumption to Ms. Key's claims, and that's because this court's precedent in cases like Kerr and Robbins make clear that as concerns the factual question of when notice of right to sue was actually received, it's appropriate to credit the plaintiff's testimony at the summary judgment stage to avoid resolution of factual issues. Where there's evidence that the plaintiff was at fault for the delayed receipt, then the three-day presumption comes in as a form of constructive notice that applies a three-day presumption to those facts, but here there's no evidence that Ms. Key was at fault for the delayed notice. She says her husband regularly checked the mail and the letter didn't come. That's exactly what her testimony is. That's exactly correct, Your Honor, and it may be different if there had been some indication of fault, but here there's simply no indication that would warrant the constructive notice of the three-day presumption. If I could turn briefly to the disparate treatment claims, the district court here erred by requiring evidence of unequal application of the no-dreadlocks policy based on race to be sure this court held in catastrophe management that a no-dreadlocks policy standing alone was not facially discriminatory. However, here Ms. Key presented evidence that the policy itself was motivated by racial animus, specifically the comment of Ms. Robinson that the Korean owners did not want African-Americans wearing their hair in this style because of the concerns about the clientele they had. The district court here dismissed that comment not based on weight or admissibility, but instead based on the premise that it was per se irrelevant because the question, the only question was whether the policy had been unequally applied based on race. And that's simply incorrect for a disparate treatment claim. What's required is evidence that an individual employment action was taken because of a protected characteristic, and we know from cases like Bostock that you don't have to show that there is in fact disparate treatment as applied to groups as a whole. The question is about the individual employment action. Here a reasonable jury could find that but for the no-dreadlocks policy, Ms. Key would not have been terminated, and that but for racial animus, the no-dreadlocks policy would not have been adopted in the first place. And the district court erred by separately requiring evidence that African-Americans as a group had been treated desperately under the no-dreadlocks policy. I'd like to turn briefly, if I could, to the retaliation claims. We recognize that this court is of course, that this panel is of course bound by the court's prior precedent regarding retaliation claims. We simply wanted to offer the EEOC's views that the standard that imputes to retaliation plaintiffs a knowledge of circuit case law is unduly restrictive and weakens the anti-retaliation provisions protections. I see that I am over time and I appreciate the court having us here today. Thank you. Thank you. Thank you for utilizing your time very efficiently. Ms. Burning. Good morning, Your Honors. May it please the court, Skylar Burnie here for Hyundai ENG America. The district court correctly dismissed and granted summary judgment on all of plaintiffs claims asserted against HEA this court should affirm. Ultimately, plaintiff failed to state any actionable claim against HEA under this court's binding precedent and the instant facts. Ms. Key's race discrimination claim fails because as this court held in catastrophe management, a race-neutral grooming policy is legal and enforceable. Of course, that has long been the law of this court and this court has traced that precedent back to the Fifth Circuit's 1970s decision in Willingham and corporate entities based on that line of precedent like HEA have long relied on this court's precedent allowing these race-neutral grooming policies. Here, this policy concerned hairstyle and the evidence does not show that HEA used that policy as a proxy for racial discrimination. Further, Ms. Key's claim regarding race retaliation further fails under this court's precedent in Harper. In Harper, the court affirmed that a plaintiff's protest about a grooming policy could not be objectively reasonable to support a claim for race retaliation. Here, Ms. Key had no objective good faith belief that the grooming policy at issue was in of itself discriminatory. The only complaints at issue here as they pertain to HEA dealt with hairstyle. Ms. Key told her trainer Ms. Howell that she felt discriminated against because she was treated unfairly because of her hair. And likewise, Ms. Williams testified that she did not understand Ms. Key's complaints to be about race. Like I said a moment ago, Your there's no evidence that this policy was enforced on a racial discriminatory basis. Ms. Williams was the policymaker. She was an African-American female and she testified that she enforced the policy uniformly. She could recall at least one white candidate that didn't qualify for a position because of the dreadlock policy. Ms. Williams never heard or saw anything suggesting the policy was race-based and she in fact testified that she would have been offended had the policy been directed only towards African-American people. For all of these reasons and those specified in our brief, we would ask this court to affirm. I'm happy to answer any additional questions. Thank you. Thank you, Mr. Burning. Ms. Brown. Ms. Brown, you represent who? Good morning, Your Honor. I'm here on behalf of Hyundai Motor Manufacturing Alabama or as I'll refer to them, HMMA. May it please the court I'll begin? Yep. This court can affirm the grant of summary judgment to HMMA on the grounds of the district court's opinion. There's no error in the district court's decisions as to that. And while those conclusions are certainly correct, they bypassed the most parsimonious conclusion the court could have reached with respect to my client HMMA, that HMMA was not the Vida Keys employer. Let's look at the three parties. DSI, a multi-state company with over 1,300 employees in seven states, provides private security staffing to businesses and other property owners and managers, had no contractual or business relationship with HMMA, posted a mailroom job on Indeed that plaintiff saw and applied for, interviewed plaintiff, made a job offer to plaintiff, hired plaintiff, set all compensation and benefits of plaintiff's employment, gave her rules about her hair, describing to her both DSI's own hair policy and HEA's own hair policy, trained her on site, gave her an orientation at DSI's branch office, where DSI's own hair policy was described. DSI's manager, Gloria Robinson, told plaintiff to leave work on July 31st, her first day of assignment, and to return with her hair under a hat. DSI requested information from plaintiff about her pregnancy and ability to do the job. DSI fielded plaintiff's request the subsequent day to speak to HR about her belief that she was being treated unfairly because of her hair. How did DSI's supervisor and manager handle that? They knew that the right person to direct her to was another DSI employee, its branch office manager, Ray Curitan. Curitan listens to her concerns at DSI's branch office, which is not located on HMMA's campus, and following that meeting, terminates her assignment to the HEA contract. Who is HEA? HEA is a California headquartered corporation that is unrelated to HMMA. It provides janitorial, construction, security, and other ancillary services to HMMA and other clients. Its employee, Cassandra Williams, wrote, revised, and exclusively maintained and interpreted the HEA appearance standard that is at issue here. HEA's Ms. Williams advised DSI that plaintiff could report to work for it with her dreadlocks if they were styled in an updo. Ms. Williams addressed plaintiff's hair with her two times. Ms. Williams requested the termination of her assignment based on the most favorable interpretation of the evidence at summary judgment. Who is HMMA? It's an auto manufacturer headquartered in Montgomery, Alabama. It gave plaintiff a safety orientation and a safety handbook, just like it does to all other employees of its contractors. It does not prohibit dreadlocks. It did not require or request that HEA prohibit dreadlocks. It didn't train plaintiff how to do her job. DSI's employees did that exclusively. It never had a personnel file or other file on plaintiff. It never requested a change to plaintiff's hair. It never requested the termination of her assignment or the removal, her removal from its facility. It did not influence the terms or positions of plaintiff's employment with DSI. All those same reasons could also lead this court to conclude, like the district court concluded with respect to the plaintiff's pregnancy claim, that HMMA could not be liable to plaintiff because it had no knowledge of any protected status or protected conduct and was not a decision maker in any relevant determination. The discrimination and retaliation laws, as this court's precedent hold, are about actual knowledge and real intent. And HMMA had none of that. With respect to Title VII exhaustion, I do want to point out, as plaintiff's counsel recognized, that the charge was crystallized as to only DSI. And there's, you know, frankly, good reason to think that that was a knowledgeable conclusion on the part of the EEOC and plaintiff, who has a master's degree. She's not helpless. She's very intelligent. She signed a charge against DSI and DSI only. And then the McKenna case heard Monday here. You know, I noted that your Honor made the point that the intake questionnaire can be important, but when a charge is filed, it crystallizes the allegations. Well, that's got to include who the responsible party is. She filed a charge against someone who happened to be the entity that gave her her paycheck, that trained her how to do the job, that gave her a detailed employee orientation and handbook. That's DSI. What's your response to the statement that was made prior that the EEOC treated the intake questionnaire as the charge eventually? Well, of course they did, 14 months later. And let's look at the prejudice of that. She was on campus on two days. How is any entity, including HMMA, which no relationship with DSI, no knowledge until that charge shows up 14 months later, everyone's forgotten about plaintiff. She was there for two days. None of our employees knew her, noticed her, etc. But we're substantially diminished in our ability to investigate that when we when we get information, a charge from a two-day employee 14 months after the fact. Thank you. Unless you have questions for me, I'll depart. I don't hear any. Ms. Lennon. Your Honors, as Ms. Palmer shared, I represent Ms. Key as it relates to the from the jury verdict. Unless there's something else you want me to address, I was going to jump straight to the issue that you were addressing with Mr. Redman about the jury charge. I think most of his arguments about this motion for neutral are meritless, but that one concerns me. Well, I think first it's important to go back to it's an abusive discretion standard. Judge Marks gave deference to the pattern instructions, and if you look at the instructions that she gave, which I apologize, I've got a cold, so I'm trying not to cough at you guys. Document entry 196 pages 96 through 97, starting at line 19. She instructs the jury, the action is protected activity that was based on Ms. Key's good faith, reasonable belief that she was discriminated against because of her race. That is an accurate statement of the law. Therefore, there's not any type of... Yeah, but for the defendant to retaliate, the defendant has to also understand there has to have been a communication to the defendant that I'm being discriminated against on the basis of race, and I think there's a jury issue about that. What's not clear to me, Ms. Leonard, is whether the jury was ever instructed that they had to make that finding of whether that was communicated or not. And I want to make sure I'm following your honor. I'm not trying to be difficult. I want to make sure I actually answer your question rather than just kind of glance off of it. Is what you're saying is that the jury should be told that Ms. Key is telling them I am complaining of race discrimination? Yes, that there is a communication of race discrimination. And that's... They can't retaliate for her complaint. And I'll follow where your honor is going. I think the problem with that is the precedent in this circuit going way back has been that you don't have to use magic words. It's circumstantial. I get that. I get that. And I'm not saying magic words. The problem, it isn't a magic words. And it's not even whether there's sufficient evidence of that. I think there is. The question is, did the jury get instructed that they have to make that finding? And they asked for an instruction for the jury to make that finding. The district court refused to give that instruction and instead gave an instruction that that would have the jury assume it's already been established. Respectfully, your honor, the instruction reads, starting at line 16, Ms. Key claims that she engaged in protect activity when she complained. I think I follow what you're saying now. The instruction is that she complained to Dynamic. Okay. Yeah. It assumes that she has done it. It never asked the jury to make that finding. And they, to their credit, they asked for an instruction that would have required the jury to make that finding. It may be that it, as between your client and Dynamic, that a lot of things need to go back. I would love a second chance at it, quite honestly. Or at least more than one thing needs to go back. I'm not sure that this retaliation claim isn't one of them. Well, and that's, and your honor, I follow what you're saying. I don't know if the judge's instruction would have made any difference at that point, though. That the record evidence does, and I may be getting to exactly what you're saying. We may be saying the same thing using different words. Because the record evidence, the first thing Ray Currington says when... I don't know how I can say that that's harmless there. Well, the Currington's first response when she shows up is, are you going to sue us? That right there shows that he is aware that she is complaining of unlawful racist claim. You're talking about whether there's evidence for that to go to the jury. I'm with you. There's evidence for that to go to the jury. That's not the question. But the jury has to make the finding on that evidence. I follow. You get it. It takes a while to get me there, but you got me there. I understand. Thank you, Ms. Leonard. Mr. Ratner. Thank you, your honor. Yes, I have two minutes for rebuttal. The court's already made my first point. Not only did they fail to give the instruction, but they really, they compounded the error by giving an instruction that says she's already done it. And Ms. Leonard is absolutely incorrect. The second sentence is not an accurate statement of the law because it is it is only part of the story. And her saying that we would have made a difference. Well, the jury should have been making that decision. That's absolutely for the jury to decide, and it is absolutely prejudicial error here when they have taken away that defense of that element of us. In my remaining time, I wanted to talk about the the notice of the right to sue and dynamic in the court's dismissal of that on summary judgment. I want to be sure the court understands Ms. Keyes' suit was not a few, Ms. Keyes' suit was a hundred and twenty days late. And the plaintiffs also, they did not mention to this court. She testified, did she not, that her husband regularly checked the mail and they did not receive it. She said she and her husband live in the house. We check our mail like everybody else does. We say that is not sufficient. That is not sufficient evidence to show that it was not her fault, particularly when you consider the evidence. And this is not a weighing because we say she gave, that she presented no evidence. She received four other letters at that same address. Dynamic received its notice. So we think that the three-day presumption does apply here. It's the plaintiff's burden to establish that she was timely filed. If there's no evidence, there's a three-day presumption. Unless she can show that it was not received due to no fault of her own. The district court found that there was substantial evidence. The EEOC's procedures were followed. She gave them a correct address, right? She got other things from them, correct? Yeah, correct, your honor. She said she didn't get that. She got what she could, right? Our position is her self-serving affidavit, I never got it, is not, you know, self-serving affidavits are generally enough. Thank you, your honor. Thank you. We'll be in recess until tomorrow.